AO 91 (Rev. 11/82)          **CRIMINAL COMPLAINT**

FILED
CLERK, U.S. DISTRICT COURT
JUN - 5 2017
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>HUBBARD BELL, SHELVIN JONES, and MARQUIS ASHLEY | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>17MJ01405 |

Complaint for violation of Title 18, United States Code, Sections 371, 922(a); and Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)

| NAME OF MAGISTRATE JUDGE<br>THE HONORABLE STEVE KIM | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>May 12, 2016 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[21 U.S.C. §§ 371, 922(a)]

Beginning on a date unknown, and continuing to the present, in Los Angeles County, within the Central District of California, and elsewhere, defendants HUBBARD BELL, SHELVIN JONES, and MARQUIS ASHLEY have engaged in the business of dealing firearms without a license.

[21 U.S.C. §§ 841(a)(1), (b)(1)(A)]

On or about May 12 and August 24, 2016, in Los Angeles County, within the Central District of California, defendant MARQUIS ASHLEY knowingly and intentionally distributed phencyclidine (PCP), in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**CHRISTOPHER RUMPH**  /S/<br>OFFICIAL TITLE<br>Special Agent, Drug Enforcement Administration |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[(1)]<br>**STEVE KIM** | DATE<br>June 5, 2017 |
|---|---|

[(1)] See Federal Rules of Criminal Procedure 3 and 54

AUSA Joseph D. Axelrad x7964     REC: Detention

## AFFIDAVIT

I, Christopher Rumph, being duly sworn, declare and state as follows:

## INTRODUCTION

1. I am a Special Agent ("SA") with the U.S. Drug Enforcement Administration and have been employed since May 2012. Since graduating from the DEA Training Academy, I have been assigned to the Los Angeles Field Division Enforcement Group 1, a general enforcement group that investigates drug traffickers and drug trafficking organizations.

2. I have received training regarding drug-trafficking organizations, as well as their drug-trafficking and money laundering activities. Through my work at the DEA, I have also conferred and interacted with experienced special agents from the Bureau of Alcohol Tobacco Firearms & Explosives, federal DEA Task Force Officers ("TFOs"), and local law enforcement investigators regarding the investigation of drug-trafficking and firearms offenses.

3. During my tenure at DEA, I have been involved in investigations regarding (1) the unlawful importation, exportation, manufacture, possession with intent to distribute, and distribution of controlled substances (including cocaine, methamphetamine, Phencyclidine ("PCP"), and marijuana), (2) the laundering of narcotics proceeds and monetary instruments derived from narcotics activities, (3) unlawful sales, possession, manufacturing, transportation, and importation of firearms, and (4) conspiracies associated with firearms and

narcotics offenses. My involvement in these investigations has included debriefing defendants, witnesses, and confidential sources; conducting physical and electronic surveillance; assisting in court-authorized interceptions; executing search and arrest warrants; seizing narcotics and narcotics-related assets; making arrests for narcotics-related offenses; and analyzing documents and records related to drug-trafficking activities and money laundering, among other things.

4. I am currently on the DEA Los Angeles Clandestine Laboratory Enforcement Team. The Clandestine Laboratory Enforcement Team focuses on the enforcement of drug crimes related to narcotics that can be manufactured in clandestine labs, including PCP, methamphetamine, MDMA, and hash oil. My clandestine laboratory training has included 40 hours at an OSHA certified Clandestine Laboratory Investigation/Certification program, 24 hours of Level "A" Operations training in the handling of hazardous material, and 24 hours of Clandestine Laboratory site safety training. I have personally assisted in the manufacture of methamphetamine in a hands-on training environment. I have trained other agents in clandestine laboratory refresher and recertification courses. I have participated in the assessment, processing, and cleanup of multiple clandestine laboratories, including PCP laboratories. I have also interviewed suspects regarding the methods of manufacturing narcotics.

2

[Instrumentality Protocol]

## PURPOSE OF AFFIDAVIT

5.  This affidavit is made in support of a complaint and arrest warrants for Marquis ASHLEY ("ASHLEY"), Shelvin JONES ("JONES"), and Hubbard BELL ("BELL"), for conspiracy, in violation of 18 U.S.C. § 371, dealing firearms without a license, in violation of 18 U.S.C. § 922(a), and distribution of a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1) ("SUBJECT OFFENSES"), as well as an application for a warrant to search the premises located at 1318 North Chester Avenue, Compton, California, 90221 ("SUBJECT PREMISES"), as described in Attachment A-1, and a gold 2007 Buick Lucerne bearing Vehicle Identification Number ("VIN") 1G4HD57267U152262, California license plate number 7UCU803 ("SUBJECT VEHICLE"), with a registered owner of "Marquis C. Ashley," as described in Attachment A-2, for the items to be seized described in Attachment B.

6.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

[Instrumentality Protocol]

### PREMISES TO BE SEARCHED

7. The property to be searched is the SUBJECT PREMISES and SUBJECT VEHICLE, described in Attachment A-1 and A-2, respectively, which are incorporated herein.

### ITEMS TO BE SEIZED

8. The items to be seized are the evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSES, as described in Attachment B, which is incorporated herein by reference. I respectfully submit that there is probable cause to believe that the items listed in Attachment B constitute evidence of the SUBJECT OFFENSES and that such items will be found at the SUBJECT PREMISES and in the SUBJECT VEHICLE.

### SUMMARY OF PROBABLE CAUSE

9. Since March 2016, law enforcement has been investigating a firearms trafficking conspiracy involving BELL, JONES, ASHLEY, and others. The investigation began when a Confidential Source ("CS") working with law enforcement explained that ASHLEY is a source of firearms and narcotics in Los Angeles. During the investigation that followed, the CS has engaged in numerous firearms and narcotics transactions with ASHLEY. Through audio and video recordings of these transactions, law enforcement has learned that BELL and JONES are ASHLEY's firearms suppliers in Texas. Indeed, on May 1, 2017, ASHELY, JONES, and BELL were present, at different points, for the sale of two firearms to the CS. Law enforcement believes that BELL and JONES obtain firearms from "gun shows"

[Instrumentality Protocol]

and gun shops in Texas before transporting the firearms to California, where they are sold by ASHLEY. Since May 2016, the CS has purchased approximately eighteen firearms from ASHLEY, JONES, and BELL. ASHLEY, BELL, and JONES are not Federal Firearms Licensees and ASHLEY is a convicted felon.

## STATEMENT OF PROBABLE CAUSE

A.  Initial Investigation of ASHLEY's Firearms and Narcotics Trafficking

10. Based on my personal involvement in this investigation and discussions with other law enforcement agents and the CS, I am aware of the following:

   a. Since March of 2016, law enforcement has conducted multiple interviews with the CS, during which the CS explained that ASHLEY is a PCP, heroin, and firearms supplier in the Los Angeles, California, area.[1]

   b. ASHLEY often sends text messages to the CS that depict multiple firearms that ASHLEY is offering for sale.[2] These text messages which include pictures of ASHLEY driving

---

[1] In March of 2016, DEA Los Angeles Field Division arrested the CS and established him/her as a Confidential Source. The CS is cooperating with law enforcement to gain consideration for pending federal drug charges. The CS's criminal history includes two prior drug-related convictions. Since working with law enforcement, the CS has consistently provided reliable and truthful information.

[2] ASHLEY's criminal history includes a 1994 juvenile conviction for grand theft auto and carrying a loaded firearm, a 1995 arrest for second degree armed robbery, a 2006 conviction for battery for which he was sentenced to 2 days' jail and 3 years' probation, a 2008 arrest for battery, a 2010 arrest for battery, a 2010 arrest for receiving stolen property, and a 2016 felony conviction for carrying a loaded firearm in a vehicle. ASHLEY is also a documented "O-hood" Crip gang member.

[Instrumentality Protocol]

with a firearm on his lap are sent for the purpose of inquiring as to whether the CS would like to purchase the specific firearm.

      c.    ASHLEY has explained to the CS that he (ASHLEY) keeps firearms at his home, the SUBJECT PREMISES, and that the CS could come to his home to look at different firearms available for purchase.

      d.    The CS further explained that ASHELY receives his guns from Texas, among other places, and that ASHLEY has previously told the CS that the person from whom he obtains the firearms makes regular trips from Texas to Los Angeles to sell approximately 30 firearms per trip.

      e.    Between May and October of 2016, the CS engaged in the following audio and video recorded firearms and narcotics transactions with ASHLEY which the affiant has reviewed:

      i.    On May 12, 2016, the CS purchased approximately 32 ounces of PCP from ASHLEY. At approximately 4:00 p.m., ASHLEY met the CS at a parking lot in Compton, CA. During the meeting ASHLEY left the CS and walked to a gold Buick[3] parked in the same parking lot (California License plate number 6SNU395 and registered to "Armando TORRES"), got into the gold Buick, and met with a man later identified as TORRES. Shortly thereafter, ASHLEY got out of the gold Buick and returned to the CS's car carrying a blue plastic bag containing 32 ounces of PCP

---

    [3]   This gold Buick is <u>not</u> the SUBJECT VEHICLE.

[Instrumentality Protocol]

in a Gatorade bottle. ASHLEY sold the CS the PCP for approximately $2,050.

   ii. On May 16, 2016, the CS purchased an AR-15-type short barrel rifle from ASHLEY while in a parking lot in Bellflower, CA.

   iii. On June 9, 2016, the CS purchased a Heckler & Koch semi-automatic handgun from ASHLEY while in a parking lot in Compton, CA.

   iv. On June 29, 2016, the CS purchased a Glock semi-automatic handgun and approximately 110 grams of heroin from ASHLEY while in a parking lot in Carson, CA. Specifically, CS met with ASHLEY at 501 E. Albertoni Street, in Carson, CA, near the Fatburger restaurant. After meeting with the CS outside of the Fatburger restaurant, law enforcement observed ASHLEY remove a shoebox from the rear of his car and place the shoebox into the CS's car. The box was later found to contain the Glock handgun. ASHLEY then entered the CS's car and transferred to him/her approximately 74.6 grams of heroin.

   v. On August 24, 2016, the CS purchased approximately one gallon of PCP from ASHLEY while in a parking lot in Compton, CA. During the meeting ASHLEY left the CS and met with TORRES, who was parked in the same parking lot in his gold Buick. ASHLEY briefly entered TORRES's gold Buick and emerged carrying a brown cardboard Home Depot box. ASHLEY returned to the CS's car and gave him/her the brown cardboard

[Instrumentality Protocol]

Home Depot box which was later found to contain approximately one gallon of PCP.

vi. On October 20, 2016, the CS met ASHLEY at a residence located at 16931 Billings Drive, Carson, California. Law enforcement agents conducting surveillance observed ASHLEY enter the house as the CS waited outside in his/her car. Shortly thereafter, ASHLEY made two separate trips out of the house to the CS's car. During the second trip, ASHLEY was seen carrying a rifle case to the CS's car. Ultimately, ASHLEY sold the CS seven firearms, including two Draco AK-47-type firearms, two drum style magazines, two Smith and Wesson .40 caliber pistols, and three Kahr .40 caliber pistols.

B. **Law Enforcement Identifies Firearms Source in Texas**

11. Based on my personal involvement in this investigation and discussions with other law enforcement agents, I am aware of the following:

a. In February of 2017, ASHLEY asked the CS to provide a trusted truck driver to transport $15,000-worth of firearms from Texas to California.

b. On February 24, 2017, the CS conducted a consensually monitored meeting with ASHLEY to discuss future firearms purchases. During the meeting, ASHLEY made a cellular video call to an individual referred to as "Jay," and who was later identified by the CS as JONES.

8

[Instrumentality Protocol]

c. On March 16, 2017, ASHLEY provided the CS with the telephone number for his firearms supplier in Texas so the CS could communicate directly with the firearms supplier.

d. On March 16, 2017, the CS used the number provided by ASHLEY, 979-267-0695, to contact JONES ("JONES's PHONE").

e. On March 23, 2017, the CS met with JONES in Hawthorne, CA, to discuss a firearms transaction. During the conversation, the CS was equipped with an audio recording device. JONES explained to the CS that he (JONES) wanted to use a truck driver provided by the CS to transport firearms from Texas to Los Angeles. During the meeting JONES and the CS discussed purchasing firearms at gun shows in Texas and transporting the firearms to California for resale. The CS left the meeting by telling JONES s/he would let JONES know when the CS's truck driver would be passing through Texas.

f. After JONES and the CS finished their conversation, law enforcement observed JONES enter the passenger side of green Kia rental car, with California license plate 7UUG868.

g. According to Fox Rent A Car records, on March 23, 2017, the green Kia had been rented to "Shelvin JONES, 7706 Summerdale Road, Richmond, TX 77469" with a listed telephone number of 281-902-9970.

h. On April 11, 2017, I performed a toll analysis on JONES's PHONE from March 11, 2017 to April 10, 2017. The

[Instrumentality Protocol]

analysis showed that JONES's PHONE was in contact with, among others, phones associated with ASHLEY and BELL.[4]

12. Based on my personal involvement in this investigation and discussions with other law enforcement agents and the CS, I am aware of the following:

    a. On May 1, 2017, the CS purchased a suspected fully automatic rifle and a handgun from ASHLEY, JONES, and BELL. Specifically, at approximately 3:12 p.m., a Kia SUV with two occupants arrived in the parking lot of the Gateway Towne Center in Compton, CA, and parked next to the CS's car. The CS subsequently identified the driver of the sedan as BELL and his passenger as JONES. ASHLEY arrived separately in the SUBJECT VEHICLE. After ASHLEY, JONES, and BELL had all arrived, ASHLEY and JONES met with the CS in the CS's car. During their meeting, BELL did not get into the CS's car but instead walked towards the east end of the parking lot. The CS was equipped with an audio and video recording device, and law enforcement conducted surveillance

    b. While in the CS's car, ASHLEY, JONES, and the CS discussed the fully automatic rifle ASHLEY and JONES were offering for sale. During their conversation, ASHLEY and JONES referred to the rifle as a "fully." Based on my training and experience, I believe the term "fully" is a reference to a fully-automatic firearm. While in the CS's car, ASHLEY and

---

[4] The phone used by ASHLEY was the same phone number used by the CS to communicate with ASHLEY, and BELL's phone number was obtained from the Los Angeles Police Department incident report of September 21, 2016.

[Instrumentality Protocol]

JONES also showed the CS a bag full of firearms that were being offered for sale and discussed the possibility of conducting future transactions at another location.

    c.    Ultimately, JONES provided the CS with a rifle bag containing an AR-15-type style rifle with no serial number and twenty-nine rounds of ammunition, as well as a .380 Ruger pistol with an obliterated serial number. The CS paid JONES $3,500 for both firearms.

    d.    During the transaction, BELL was seen returning to the rental car and opening and closing the rear cargo-area of the car before getting into the driver's seat.

    e.    Following the firearms transaction, JONES returned to the rental car where BELL was waiting and placed the bag full of firearms in the rear cargo-area of the car.

    f.    Following the transaction, and after the CS left the parking lot, BELL was observed speaking with ASHLEY.

    g.    During the debrief of the CS following the transaction, the CS was shown pictures of JONES and BELL from their respective Texas driver's license. The CS positively identified JONES as "Jay" and the same individual from whom he/she purchased the firearms. The CS also positively identified BELL as the driver of the Kia sedan.

    h.    Inquiries of Fox Rent A Car, determined that the Kia SUV had been rented on May 1, 2017, by BELL, with contact information of 2701 East Belford Apt. 921, Houston, TX, and a phone number of 281-902-2970.

[Instrumentality Protocol]

13. Based on my personal involvement in this investigation and discussions with other law enforcement agents and the CS, I am aware of the following:

    a. On May 12, 2017, the CS purchased six firearms from ASHLEY. Specifically, at approximately 1:48p.m., ASHLEY arrived in the parking lot of the Gateway Towne Center in Compton, CA. ASHLEY removed a black duffle-bag from the trunk of the SUBJECT VEHICLE and entered the CS's car. The CS was equipped with an audio and video recording device.

    b. Once in the CS's car, ASHLEY talked with the CS about various firearms contained in the black duffle-bag, after which ASHLEY sold the CS six modified firearms for $8,000. The firearms include: two Inter Ordinance .762 caliber pistols with no or obliterated serial number; a Radical Firearms .223/.556 caliber pistol, serial number RFT01214; a Keltec .556 caliber pistol with no and/or obliterated serial number with a magazine loaded with twenty-four rounds of .223 ammunition; a Keltec .556 caliber pistol with no or obliterated serial number and magazine; a Romarm/Cugir .762 caliber pistol with no or obliterated serial number; and a box containing fifty rounds of .223 caliber ammunition and assorted firearm magazines and parts.

C. **Additional Investigation of ASHLEY, BELL, and JONES**

14. Based on my involvement in this investigation, as well as conversations with other law enforcement agents involved in the investigation, I am aware of the following:

[Instrumentality Protocol]

a. On September 21, 2016, the Los Angeles Police Department executed a search warrant related to a homicide investigation at 4114 Crenshaw Blvd., Los Angeles, California. Kevin Mitchell and BELL were detained and two handguns were recovered. In the trunk of Mitchell's vehicle, officers found a gun case containing a boarding pass and luggage receipt for BELL, which indicated that he checked firearms on a flight on September 19, 2016.

b. A subsequent query of Transportation Security Administration databases shows that BELL flew from Houston International Airport to Los Angeles International Airport on September 19, 2016.

c. In October 2016, the Inglewood Police Department recovered a 9mm pistol during a traffic stop of Chad Johnson, a convicted felon and active member of the Inglewood Family street gang. Based on subsequent investigation, law enforcement determined that the pistol was purchased on August 27, 2016, by BELL at a gun show in Houston, Texas.

d. On November 22, 2016, LAPD officers along with ATF Special Agents conducted surveillance prior to executing a search warrant at the residence located at 5232 Fairview, Los Angeles, California. During the surveillance, law enforcement observed Nico Shores and Kevin Mitchell leave the residence. Ten firearms including a fully automatic rifle, a silencer, and several pounds of narcotics were recovered. One of the firearms

[Instrumentality Protocol]

recovered during this search warrant was registered to BELL and was purchased by BELL in Texas.

  e. On December 12, 2016, an LAPD officer was involved in a shooting when a suspect pointed a gun at the officer. During the investigation that followed, the suspect's residence was searched and law enforcement recovered ten firearms, one of which had been previously purchased by BELL in Texas.

  f. On February 15, 2017, a .40 caliber pistol was recovered at the termination of a law enforcement pursuit that followed a suspected assault with deadly weapon on a police officer. Based on subsequent investigation, law enforcement determined that the .40 caliber pistol had previously been purchased in October 2016 by BELL.

  g. In May of 2017, an ATF inquiry of the National Firearms Registry and Transfer Record showed that BELL has purchased approximately 100 firearms that were reported during different transactions on ATF Reports of Multiple Sale or Other Disposition of Pistols and Revolvers.[5]

  h. In May of 2017, an ATF inquiry into JONES revealed that JONES has had no Multiple Sales purchases and no firearms traces.

---

[5] In the event that an individual purchases two or more handguns within a five-day period from a Federal Firearms Licensee, the Licensee is required to complete a report that is sent to ATF that documents the sale. Importantly, this reporting requirement does not require Licensees to report the sale of rifles and shotguns, or single handgun purchases from a Licensee.

[Instrumentality Protocol]